FOREMOST INSURANCE COMPANY v ALLSTATE
INSURANCE COMPANY

Docket No. 89808. Argued January 7, 1992 (Calendar No. 6). Decided
May 15, 1992.

Foremost Insurance Company, as subrogee of the State Employ-
ees Credit Union, brought an action in the Ingham Circuit
Court against Allstate Insurance Company, seeking to recover
for the loss of a motor home insured by Allstate, of which the
credit union was the lienholder, under a loss payable clause,
following the burning of the motor home by the insured. The
court, Thomas L. Brown, J., granted summary disposition for
the plaintiff. The Court of Appeals, GILLIS, P.J., and McDONALD
and J. W. FITZGERALD, JJ., affirmed in an opinion per curiam,
holding that because the State Employees Credit Union as
lienholder had a separate contract with the insurer arising
from the insured's policy, it was entitled to recovery under the
loss payable clause even though the insured was excluded from
recovering. The Court concluded that the insured's acts of
arson and subsequent misrepresentation did not preclude the
lienholder's recovery (Docket No. 115901). Allstate appeals.

In an opinion by Justice RILEY, joined by Justices LEVIN,
GRIFFIN, and MALLETT, the Supreme Court held:

The insured's acts of arson do not preclude recovery by the
State Employees Credit Union as lienholder for the insured
property under the standard loss payable clause.

1. In general, there are two types of loss payable clauses,
otherwise known as mortgage clauses, contained in insurance
policies that protect lienholders: ordinary and standard. Under
an ordinary loss payable clause, the lienholder's right of recov-
ery is no greater than the insured's, and a breach of the
conditions of the policy by the insured precludes recovery by
the lienholder. Under the standard loss payable clause, which
applies in this case, a lienholder is not subject to the exclusions

REFERENCES

Am Jur 2d, Insurance §§ 493, 959, 1498 et seq.
See the Index to Annotations under Fire Insurance; Insurance and
Insurance Companies; Liens and Encumbrances.

available to the insurer against the insured because an independent or separate contract of insurance exists between the lienholder and the insurer. The consideration for the contract with the lienholder is that paid by the insured for the policy itself.

2. Allowing a lienholder to recover its interest in property intentionally destroyed by an insured under a standard loss payable clause protects the lienholder's insurable interest in accordance with what the insurer promised to do, i.e., to cover the lienholder's security interest in the insured's property regardless of any act or neglect of the insured. Thus, the insured's acts of arson and misrepresentation to Allstate did not preclude the State Employees Credit Union as lienholder from recovering under the standard loss payable clause.

Justice BOYLE concurred except with respect to the question of conversion, and, instead, concurred with Justice BRICKLEY's resolution of the issue.

Justice BRICKLEY, joined by Chief Justice CAVANAGH, concurring, stated that the loss payable clause provides for recovery only where there has been loss or damage under the policy, and its "any act or neglect" language cannot create a covered loss where there is none. There is a difference between acts that invalidate coverage and those that result in an exclusion from coverage. The policy's loss payable clause provides that the lienholder's coverage shall not be invalidated by any act or neglect of the owner of the insured property. An intentional act that results in the destruction of the property is not an act that invalidates coverage; rather, such an act of destruction simply is not covered. The "any act or neglect" language protects the lienholder only from the owner's acts or neglect that would invalidate the policy.

Foremost can recover under the loss payable clause, however, because the loss was accidental from the perspective of the lienholder. Under a standard loss payable clause the lienholder's right of recovery is not derivative because there are two contracts of insurance within the policy—one between the lienholder and the insurer and the other between the insured and the insurer. Likewise, the provision against conversion protects the lienholder's interest in the insured property. Strictly construed, it does not include the intentional destruction of the insured property by arson.

Affirmed.

185 Mich App 119; 460 NW2d 242 (1990) affirmed.

*Boyd v GMAC,* 162 Mich App 446; 413 NW2d 683 (1987), overruled.

*GMAC v ACIA,* 168 Mich App 733; 425 NW2d 156 (1988), overruled.

*GMAC v Ibrahim,* 171 Mich App 483; 431 NW2d 41 (1988), overruled.

INSURANCE — ARSON — LIENHOLDERS — STANDARD LOSS PAYABLE
     CLAUSE.

An insured's act of arson of insured property does not preclude recovery by a lienholder for the property under a standard loss payable clause.

*Willingham & Coté, P.C.* (by *Curtis R. Hadley* and *John A. Yeager*), for the plaintiff.

*Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald, P.C.* (by *Curt A. Benson* and *Jeffrey R. Learned*), for the defendant.

Amici Curiae:

*O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C.* (by *Neil J. Lehto*), for General Motors Acceptance Corporation.

*Gross & Nemeth* (by *James G. Gross*) for Auto Club Insurance Association and Castle Insurance Company.

*Strobl & Manoogian, P.C.* (by *Brian C. Manoogian* and *Brian M. Gottry*), for Chrysler Credit Corporation.

RILEY, J. We granted leave to appeal to resolve a conflict in the Court of Appeals[1] over whether a

---

[1] *Boyd v General Motors Acceptance Corp,* 162 Mich App 446; 413 NW2d 683 (1987); *General Motors Acceptance Corp v Auto Club Ins Ass'n,* 168 Mich App 733; 425 NW2d 156 (1988); *General Motors Acceptance Corp v Ibrahim,* 171 Mich App 483; 431 NW2d 41 (1988); cf. *Foremost Ins Co v Allstate Ins Co,* 185 Mich App 119; 460 NW2d 242 (1990).

lienholder may recover under a loss payable clause where the insured breached an insurance contract by intentionally destroying his property and misrepresenting the loss to his insurer.[2] In cases involving nearly identical loss payable clauses, two Court of Appeals panels agreed that a standard loss payable clause operates as a separate contract of insurance between the lienholder and the insurer, yet differed over the coverage conferred upon the lienholder.[3] The *Boyd* Court concluded that a lienholder's right of recovery is no greater than that of the insured, and because the insured's intentional act of destroying her automobile was excluded under the terms of the policy, the lienholder could not recover under the loss payable clause when the insured intentionally destroyed her vehicle.[4] However, in the instant case, the *Foremost* panel concluded that because the lienholder has a separate contract with the insurer, it is entitled to recovery under the loss payable clause even when the insured was excluded from recovering under the same policy.[5] We are persuaded that the *Foremost* panel correctly concluded that the insured's acts of arson do not preclude the lienholder's recovery from the insurer, and now affirm.

I

The parties stipulated the following set of facts pursuant to MCR 2.116(A)(2).

On July 24, 1985, Bobby Taylor executed an installment note with the State Employees Credit

---

[2] 437 Mich 1035 (1991).

[3] *Boyd,* n 1 *supra* at 453; *Foremost,* n 1 *supra* at 121.

[4] *Boyd* at 455-457.

[5] *Foremost* at 121-122.

Union. The note was secured by a 1982 Be[e]ch-craft motor home. The State Employees Credit Union was named as a lienholder on the title to the motor home. On the same date, Bobby Taylor entered into a separate contract with Allstate Insurance Company (Allstate) to provide motor vehicle insurance for the motor home. The declaration sheet and the certificate of insurance designated State Employees Credit Union as a lienholder.

In recognition of State Employees Credit Union's interest in Bobby Taylor's vehicle, Allstate Insurance Company issued to the Credit Union a "Loss Payable Clause," which reads in pertinent part as follows:

"Loss or damage, if any, under the policy shall be payable as interest may appear to [State Employees Credit Union] and this insurance as to the interest of the Bailment Lessor, Conditional Vendor, Mortgagee or other secured party of Assignee of Bailment Lessor, Conditional Vendor, Mortgagee or other secured party [herein called a Lienholder] shall not be invalidated by any act or neglect of the Lessee, Mortgagor, Owner of the within described automobile or other Debtor nor by any change in the title or ownership of the property; provided, however, that the conversion, embezzlement or secretion by the Lessee, Mortgagor, Purchaser or other Debtor in possession of the property insured under a bailment lease, conditional sale, mortgage or other security agreement is not covered under such policy unless specifically insured against and premium paid therefor . . . ."

On August 25, 1985, the motor home was destroyed by an incendiary fire. Bobby Taylor filed a claim with Allstate for insurance proceeds. It is undisputed that Bobby Taylor committed arson in an effort to defraud the Company. In addition, Mr. Taylor committed fraud and false swearing. His acts amounted to a material breach of contract, and on June 11, 1986, Allstate expressly and unequivocally denied his claim.

State Employees Credit Union, in its letter of April 22, 1986, requested Allstate to provide coverage under the policy issued to Bobby Taylor based on its interest in the motor home as a lienholder. On June 16, 1986, State Employees Credit Union's request for coverage under the insurance policy issued to Bobby Taylor was denied.

On February 10, 1988, Foremost Insurance Company, as subrogee of State Employees Credit Union, filed a Complaint against Allstate seeking to recover for the loss of the motor home.

II

In general, there are two types of loss payable clauses, otherwise known as mortgage clauses, contained in insurance policies which protect lienholders. The first type, commonly known as an ordinary loss payable clause, directs the insurer to pay the proceeds of the policy to the lienholder, as its interest may appear, before the insured receives payment on the policy.[6] Under this type of policy, the lienholder is simply an appointee to receive the insurance fund to the extent of its interest, and its right of recovery is no greater than the right of the insured.[7] There is no privity of contract between the two parties because there is no consideration given by the lienholder to the insured.[8] Accordingly, a breach of the conditions of the policy by the insured would prevent recovery by the lienholder.[9]

The second type of loss payable clause is known

[6] *Van Buren v St Joseph Co Village Fire Ins Co,* 28 Mich 398, 405 (1874); *Gallant v Lake States Mut Ins Co,* 142 Mich App 183, 187; 369 NW2d 205 (1985); *J C Wyckoff & Associates v Standard Fire Ins Co,* 936 F2d 1474, 1493 (CA 6, 1991).

[7] *Van Buren,* n 6 *supra* at 404; *Gallant,* n 6 *supra* at 187.

[8] See 10A Couch, Insurance, 2d (rev ed), § 42:702, p 738; *Van Buren, supra* at 404.

[9] *Id.*

as a standard loss payable clause.[10] Under this type of clause, a lienholder is not subject to the exclusions available to the insurer against the insured because an independent or separate contract of insurance exists between the lienholder and the insurer.[11] In other words, there are two contracts of insurance within the policy—one with the lienholder and the insurer and the other with the insured and the insurer. Under the standard loss payable clause, the consideration for the insurer's contract with the lienholder is that which the insured paid for the policy itself.[12]

Traditionally, insurers have undertaken the risk that the insured will commit fraud against them by inserting a standard loss payable clause in the insurance contract for the lienholder's protection.[13] The lienholder, usually the financial or lending institution, is assured, through the incorporation of the clause, that they will not be required to evaluate the borrower's insurance claim history when approving a loan.[14] Thus, the lender protects its interest by requiring the borrower to obtain insurance with a loss payable clause made payable to the lender prior to purchasing the vehicle that will protect the lender against the defenses that

[10] Insurance companies have used standard loss payable clauses in real estate fire insurance policies since at least 1878. *Hastings v Westchester Fire Ins Co,* 73 NY 141 (1878). For an interesting and complete historical review of mortgage arrangements, see Lehto, *The standard mortgage clause under attack: The lender's insurance claim when a borrower commits arson,* 66 U Det L R 603, 607 (1989).

[11] *Citizens State Bank v State Mut Fire Ins Co,* 276 Mich 62, 67-69; 267 NW 785 (1936); *Pink v Smith,* 281 Mich 107, 111-112; 274 NW 727 (1937); *Cottrell v Clark,* 126 Mich App 276, 280; 337 NW2d 58 (1983).
See also *Vormelker v Oleksinski,* 40 Mich App 618, 624; 199 NW2d 287 (1972); *Cole v Michigan Mut Ins Co,* 116 Mich App 51, 55; 321 NW2d 839 (1982); Heritage Federal Savings Bank v Cincinnati Ins Co, 180 Mich App 720, 723-724; 448 NW2d 39 (1989).

[12] Couch, n 8 *supra,* § 42:728, pp 763-764.

[13] Lehto, *The standard mortgage clause,* n 10 *supra.*

[14] *Id.*

could be asserted against the borrower by the insurer.

In the instant case, both parties agree that the loss payable clause used by Allstate is a standard loss payable clause. Allstate, however, argues that its clause does not operate as a standard loss payable clause in the traditional sense because it provides less than complete protection: it excludes coverage where the insured converts, embezzles, or secretes the property.[15] Thus, Allstate would have us read the loss payable clause in reference to the underlying insurance policy that defines "loss" as a "direct and accidental loss" and take the coverage for the lienholder out of its hands. We do not agree.

We believe that Allstate's argument misses the mark because it runs contrary to the language and the purpose of the standard loss payable clause in its policy.[16]

---

[15] The exclusion barring a lender's claim for the insured's conversion, embezzlement, or secretion of its automobile has been part of the standard loss payable clause included in automobile insurance policies since at least 1920. *Buxton v Int'l Indemnity Co*, 47 Cal App 583; 191 P 84 (1920). See also Lehto, *The standard mortgage clause*, n 10 *supra* at 607. Florida courts have classified this type of loss payable clause as a "hybrid" clause because it provides for coverage through neglect of any act of the insured, and also establishes several instances where coverage would not exist—conversion, embezzlement, or secretion. *Progressive American Ins Co v Florida Bank at Daytona Beach*, 452 So 2d 42, 44-45 (Fla, 1984).

[16] The purpose of a standard loss payable clause was explained by Judge Rapallo in his concurring opinion in *Hastings*, n 10 *supra* at 154, the first recorded decision explaining this type of mortgage arrangement.

> I think the intent of the clause was to make the policy operate as an insurance of the mortgagors and the mortgagees separately, and to give the mortgagees the same benefit as if they had taken out a separate policy, free from the conditions imposed upon the owners, making the mortgagees responsible only for their own acts. . . . This provision, in case the policy were invalidated as to the mortgagors, made it, in substance, an insurance solely of the interest of the mortgagees, by direct contract with them, unaffected by any questions which might exist between the company and the mortgagors.

See also Lehto, *The standard mortgage clause*, n 10 *supra* at 607.

We are persuaded that under Allstate's theory of the case the inclusion of the specific prohibition against recovery in a standard mortgage clause—where the insured converts, embezzles, or secretes the property—would be rendered either redundant or meaningless.[17] The exclusions in the standard loss payable clause would be rendered meaningless because losses in the described circumstances are never accidental. Embezzlement, conversion, and secretion require an intentional act by the defendant of dominion or control over the property that is inconsistent with an owner's property rights.[18] Moreover, it would be redundant to provide for the three exclusions because these acts are already excluded from coverage in the underlying policy of the insured.

We also believe that under Allstate's theory of the case, an insurer would be able to avoid its basic promise to hold the lienholder harmless from any act or neglect by the insured and, therefore, the lienholder would only be entitled to recover for an accidental loss. Allstate has failed to recognize the significance of the fact that we are evaluating two separate contracts of insurance. The *Boyd* Court's analysis is illustrative of the problems that arise by not recognizing the significance of the two contracts when evaluating the standard loss payable clause at issue.

In 1981, Boyd entered into a standard installment sales agreement with General Motors Acceptance Corporation to finance the purchase of her

[17] The Massachusetts Supreme Court has reached the same conclusion in *Gibraltar Financial Corp v Lumbermens Mut Casualty Co,* 400 Mass 870, 871-873; 513 NE2d 681 (1987).

[18] Embezzlement differs from conversion and secretion in that it focuses on a narrow type of relationship between the owner and the defendant. See *People v Doe,* 264 Mich 475, 481; 250 NW 270 (1933); *People v Bergman,* 246 Mich 68; 224 NW 375 (1929). See, generally, 12 Michigan Practice, Criminal Law, §§ 7.72, 7.83, pp 85-86, 97-100.

new automobile.[19] As part of this agreement, GMAC, the lienholder, conditioned the financing of the vehicle upon her obtaining insurance while the vehicle was being financed.[20] Boyd insured the car with Auto Club Insurance Association and listed GMAC as the loss payee in its standard loss payable clause.[21] ACIA's standard loss payable clause is almost identical to the clause used by Allstate in the instant case.[22]

A few years later, Boyd reported the car stolen and filed a claim with ACIA.[23] ACIA denied her claim, alleging that Boyd intentionally destroyed the car, and also denied the claim of GMAC as the security lienholder under the loss payable clause, on the basis of its belief that a lienholder is subject to the same exclusions as the insured because it is part of the same insurance policy and does not provide any greater coverage than that provided in the policy.

---

[19] *Boyd,* n 1 *supra* at 448.

[20] *Id.* at 449.

[21] *Id.*

[22] The loss payable clause in *Boyd* provided in pertinent part:

"Loss or damage, if any, under the policy shall be payable as interest may appear to . . . [lienholder] and this insurance as to the interest of the Bailment Lessor, Conditional Vendor, Mortgagee or other secured party or Assignee of Bailment Lessor, Conditional Vendor, Mortgagee or other secured party (herein called the Lienholder) shall not be invalidated by any act or neglect of the Lessee, Mortgagor, Owner of the within described automobile or other Debtor nor by any change in the title or ownership of the property; provided, however, that the conversion, embezzlement or secretion by the Lessee, Mortgagor, Purchaser or other Debtor in possession of the property insured under a bailment lease, conditional sale, mortgage or other security agreement is not covered under such policy, unless specifically insured against and premium paid therefor; and provided, also, that in case the Lessee, Mortgagor, Owner or other Debtor shall neglect to pay any premium due under such policy the Lienholder shall, on demand, pay the same." [*Id.* at 449-450.]

[23] *Id.* at 450.

In reversing the trial court's grant of summary disposition for GMAC, the Court of Appeals held that the loss payable clause would only protect GMAC with regard to risk otherwise covered in the ACIA policy.[24] The Court reasoned that because Boyd's intentional destruction of the vehicle was not a covered risk under the policy, and because the loss payable clause only protected GMAC from covered risk, GMAC was not entitled to any insurance proceeds.

The *Boyd* Court, as does Allstate, misinterprets the nature of the standard loss payable clause in relation to the policy issued to the insured by the insurer.[25] As we have previously noted, there are two contracts of insurance involved in this case. One covers risk and outlines exclusions for the insured and the insurer. The other operates as an independent contract for the limited purpose of preventing the loss of coverage by any act or neglect between the insurer and the insured.[26] The prevention of recovery under the contract between the insured and the insurer does not prohibit the recovery by the lienholder under its separate contract of insurance with the insurer because the

[24] *Id.* at 458.

[25] We believe that Justice BRICKLEY errs, as did the *Boyd* Court, in his analysis of the clause. Initially, he agrees with us that the mortgage clause at issue in this case is a standard loss payable clause. However, he construes the language of the conversion proviso as referencing the lienholder's lien. The effect of this construction not only is at odds with the language of the proviso, but also renders the "any act or neglect" language of the standard loss payable clause meaningless. Under his construction, any act or neglect of the insured would invalidate the lienholder's interest in the insurance policy. The effect of this construction would be to render this clause as an ordinary mortgage clause having only one contract between all three parties. Because we believe that there are two contracts of insurance in this standard loss payable clause, we cannot agree with this analysis.

[26] Except, of course, conversion, embezzlement, and secretion. See *ante,* p 382.

exclusions in the standard loss payable clause do not apply.[27]

We are not alone in the conclusion we reach today. Every jurisdiction that has considered this issue in light of the same or similar standard loss payable clauses has concluded that the lienholder's interest in the insured's property will not be avoided by any acts, representations, or omissions of the insured.[28]

> Thus a policy payable to the mortgagee as his interest may appear, and which contains clauses of the character under consideration, is to be construed so as to effectuate the parties' interests, and so constitutes two separate contracts of indemnity which relate to the same subject matter, but cover distinct interests therein, and it effects a new and independent insurance which protects the mortgagee as stipulated, and which cannot be destroyed or impaired by the mortgagor's acts or by those of

[27] Our analysis does not obviate the general rule, with respect to construction of contracts, that where one writing refers to another, the two writings are to be construed together. *Whittlesey v Herbrand Co,* 217 Mich 625, 627-628; 187 NW 279 (1922). Nor does it ignore the distinction between conditions subsequent for coverage and exclusions from coverage. As the *Boyd* Court recognized:

> "A condition subsequent is to be distinguished from an *exclusion from the coverage:* the breach of the former is to terminate or suspend the insurance, while the effect of the latter is to declare that there never was insurance with respect to the excluded risk. Accordingly, the suicide clause in a life insurance policy is not a condition subsequent but rather suicide is simply not a risk insured against." [*Boyd,* n 1 *supra* at 455, quoting 7 Couch, Insurance, 2d (rev ed), § 36:49, pp 482-483.]

The purpose of the standard loss payable clause is to confer greater coverage to the lienholder than the insured has in the underlying policy. This is the distinction between that type of coverage and the coverage involved in an ordinary loss payable clause, which merely assigns the proceeds of the policy to the lienholder upon destruction of the automobile but does not cover the intentional acts or neglect of the insured.

[28] See also 5A Appleman, Insurance Law & Practice, § 3401, p 286.

any person other than the mortgagee or someone authorized to act for him and in his behalf.[29]

### III

Allstate suggests that if we find that their loss payable clause operates as a traditional standard loss payable clause, coverage should be denied to Foremost because Bobby Taylor converted the State Employees Credit Union's interest in the motor home when he intentionally destroyed it.

The crux of Allstate's argument is that the conversion proviso refers to State Employees Credit Union's lien or security interest. Foremost, however, argues that it refers to Bobby Taylor's motor home. The pertinent part of Allstate's standard loss payable clause provides:

> "[p]*rovided, however, that the conversion,* embezzlement or secretion *by the* Lessee, *Mortgagor,* Purchaser or other Debtor in possession *of the property insured* under a bailment lease, conditional sale, mortgage or other security agreement is not covered under such policy, unless specifically insured against and premium paid therefor . . . ." [Emphasis added.]

We are persuaded that the exclusion simply provides that the insured will not be covered when he converts his own property. In other words, the conversion provision focuses on the insured's property and not on State Employees Credit Union's lien.[30] Having so concluded, we must now deter-

---

[29] Couch, n 8 *supra,* § 42:736, pp 768-771.

[30] We believe Justice BRICKLEY errs in asserting that the language or the purpose of the proviso references the lienholder's interest. The language of the conversion proviso supports our conclusion that the exclusion solely refers to the insured's property. We additionally note, in support of our conclusion, that when the Massachusetts Supreme Court evaluated an identical conversion exclusion in *Gibraltar Financial Corp,* n 17 *supra* at 872-873, it reached the same conclusion as we do today. In *Gibraltar,* the court concluded:

mine whether Bobby Taylor converted the mobile home when he intentionally destroyed it.

In the civil context, conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.[31] In general, it is viewed as an intentional tort in the sense that the converter's actions are wilful, although the tort can be committed unwittingly if unaware of the plaintiff's outstanding property interest.[32]

In the instant case, we believe that Bobby Taylor's intentional destruction of his motor home, as well as his fraud and false swearing to his insurer, Allstate, cannot be considered conversion. In each of the cases referred to above, the property converted belonged to another person who had original ownership or possession. In this case, however, the alleged converter owned the item that Allstate contends was converted. We agree with the Court of Appeals in the instant case that "a person can[not] 'convert' his own property," and therefore we reject Allstate's second argument.[33]

## IV

Allstate's final argument is that public policy should preclude recovery by the lienholder because allowing recovery will encourage automobile own-

A simple reading of the loss payable clause reveals that it is a conversion of the insured property, not of the mortgagee's interest in that property, which would shield the insurer from liability.

[31] *Nelson & Witt v Texas Co,* 256 Mich 65, 70; 239 NW 289 (1931); *Thoma v Tracy Motor Sales, Inc,* 360 Mich 434, 438; 104 NW2d 360 (1960); *Citizens Ins Co v Delcamp,* 178 Mich App 570, 575; 444 NW2d 210 (1985).

[32] *Warren Tool Co v Stephenson,* 11 Mich App 274, 299; 161 NW2d 133 (1968); *Citizens Ins Co,* n 31 supra.

[33] *Foremost Ins Co,* n 1 supra at 122.

ers to intentionally burn their vehicles, and will invite collusion between borrowers and lenders in the conventional automobile financing arrangements. We find this argument untenable.

Allowing a lienholder to recover its interest in the property that was intentionally destroyed by the insured under a standard loss payable clause simply protects the lienholder's insurable interest in accordance with what the insurer promised to do. That is, the insurer promised to cover the lienholder's security interest in the insured's automobile regardless of any act or neglect of the insured. Thus, rejection of Allstate's public policy arguments, which endorse the holding in *Boyd,* would at most simply return lenders and insurance companies to the traditional role they play in the commercial marketplace. Lenders will be returned to the role of evaluating credit risk associated with the making of commercial loans, and insurance companies will be returned to their traditional role of evaluating every conceivable risk of loss in order to price their respective premiums for policyholders.[34]

---

[34] We note that should Allstate wish to avoid liability to lienholders where insureds intentionally destroy their vehicles by arson, it can easily add arson to the list of owner acts excluded from coverage in its standard loss payable clause. Amicus curiae ACIA, who has submitted a brief in support of Allstate, has revised its list of owner acts excluded from coverage in its standard loss payable contracts. A certified copy of ACIA's revised loss payable clause provides in pertinent part:

> We agree that this Endorsement shall not be invalidated as to the interest of the Lienholder in the described vehicle by any act or neglect of any Named Insured or of any owner except:
>
> 1) When that vehicle is intentionally damaged, destroyed or concealed by or at the direction of any Named Insured or by any owner; or
>
> 2) When the vehicle is damaged, destroyed or concealed as a result of any other act which constitutes a breach of contract between any Named Insured or owner and the Lienholder.

We, therefore, conclude that the insured's acts of arson and misrepresentation to Allstate did not preclude Allstate's coverage to State Employees Credit Union under the standard loss payable clause. Thus, to the extent inconsistent with this opinion, we overrule *Boyd v General Motors Acceptance Corp* and its progeny.[35] The Court of Appeals decision in the instant case is affirmed.

LEVIN, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

BOYLE, J. I concur except as to the issue discussed in part III as to which I concur with Justice BRICKLEY's part II.

BRICKLEY, J. (*concurring*). I agree with the majority's conclusion that because a lienholder has a separate contract of insurance with an insurer, pursuant to a standard loss payable clause, it is entitled to recovery under the policy even when the owner of the insured property was excluded from recovery. I write separately to address more directly the language of the insurance contract and to further explain my reasoning.

I

Relying on *Boyd v General Motors Acceptance Corp,* 162 Mich App 446; 413 NW2d 683 (1987), Allstate argues that the standard loss payable clause included in its policy issued to Bobby Taylor does not allow Foremost to recover where there has been no covered "loss" from the perspective of Bobby Taylor. The loss payable clause provides, in pertinent part:

[35] *General Motors Acceptance Corp v Auto Club Ins Ass'n,* n 1 *supra; General Motors Acceptance Corp v Ibrahim,* n 1 *supra.*

Loss or damage, if any, under the policy shall be
payable as interest may appear to [State Employ-
ees Credit Union] and this insurance as to the
interest of the [lienholder] shall not be invalidated
by any act or neglect of the Lessee, Mortgagor,
Owner of the within described automobile or other
Debtor nor by any change in the title or ownership
of the property . . . .

Allstate argues, and the *Boyd* Court held, that
because "loss" is defined in the policy as "direct
and accidental loss of or damage to" the auto-
mobile, Bobby Taylor's *intentional* destruction by
fire of his vehicle did not result in a "loss" accord-
ing to the meaning of that term as used in the
policy. Thus, according to the *Boyd* analysis, be-
cause the loss payable clause only allows recovery
where there is "[l]oss or damage, if any, under the
policy," the lienholder has no right of recovery
where the owner of the insured vehicle intention-
ally destroys it. *Boyd, supra* at 453.

The majority rejects Allstate's argument as be-
ing contrary to the *purpose* of a standard loss
payable clause because it would allow an insurer
to "avoid its basic promise to hold the lienholder
harmless from any act or neglect by the
insured . . . ." *Ante* at 386. I reject Allstate's
argument as being contrary to the *language* of the
standard loss payable clause in its policy.

### A

I agree with Allstate that Foremost cannot re-
cover unless there has been a loss under the
policy. Therefore, to the extent that the majority
relies on the "any act or neglect" language of the
loss payable clause, I disagree. As the *Boyd* Court
noted, *supra* at 455, there is a difference between
acts that *invalidate* coverage and acts that result
in an *exclusion* from coverage:

> "A condition subsequent is to be distinguished
> from an exclusion from the coverage: the breach of
> the former is to terminate or suspend the insur-
> ance, while the effect of the latter is to declare
> that there never was insurance with respect to the
> excluded risk. Accordingly, the suicide clause in a
> life insurance policy is not a condition subsequent
> but rather suicide is simply not a risk insured
> against." [*Id.* at 455, quoting 7 Couch, Insurance,
> 2d (rev ed), § 36:49, p 483.]

The loss payable clause in Allstate's policy pro-
vides that the lienholder's coverage "shall not be
*invalidated* by any act or neglect" of Bobby Taylor.
However, an intentional act that results in the
destruction of the insured property is not an act
that *invalidates* the coverage; rather, such an act
of destruction is not included in the coverage of
the policy. Thus, the "any act or neglect" language
in the loss payable clause protects the lienholder
only from Bobby Taylor's acts or neglect that
would *invalidate* the policy. Therefore, the loss
payable clause provides for recovery only where
there has been loss or damage under the policy,
and the "any act or neglect" language cannot
create a covered loss where there is none.

## B

Although I agree with Allstate and the *Boyd*
panel with respect to the construction of the "any
act or neglect" language, I conclude that Foremost
can recover under the loss payable clause because
the loss was "accidental" from the perspective of
the lienholder. Implicit in the *Boyd* Court's hold-
ing is the conclusion that the policy definition of
"loss" as "accidental" means that a loss must be
accidental from the perspective of the insured. I
agree. Clearly, the definition of loss as "accidental"

would negate coverage under the policy for all loss or damage that results from intentional acts by parties other than the insured if a loss must be accidental from everyone's standpoint. If that were the case, the owner of the car could not recover when a third party intentionally destroyed his car and, further, theft coverage under the policy would be meaningless. Thus, under Allstate's policy, whether a loss is "accidental" must be determined from the perspective of the insured.

While the *Boyd* Court stated it had no quarrel with other decisions holding that the standard loss payable clause constitutes a separate contract of insurance, *id.* at 453, the Court failed to grasp the significance of this fact. The majority correctly finds that the standard loss payable clause differs from an ordinary loss payable clause where the lienholder is merely an appointee and has no right of recovery greater than the right of the owner of the insured property. *Ante* at 383-384. In contrast, under a standard loss payable clause the lienholder's right of recovery is not derivative because, as the majority notes, "there are two contracts of insurance within the policy—one with the lienholder and the insurer and the other with the insured and the insurer." *Id.* at 384.[1] Like the *Boyd* panel, in concluding that Foremost can re-

[1] See also 5A Appleman, Insurance Law & Practice, § 3401, pp 286-288:

> Some cases have held that a mortgage loss payable clause is, in effect, an independent agreement with the mortgagee, creating an independent contract between the company and the mortgagee for the latter's benefit. It is definitely true that this result obtains under a union or standard mortgage clause, it being considered that there the insurer has entered into a separate contract with the mortgagee just as if the latter had applied for the insurance entirely independently of the mortgagor.

cover, the majority misses the significance of the two separate contracts of insurance.

Because the standard loss payable clause creates a separate contract of insurance between the lienholder and the insurer, the lienholder is also clearly an *insured* under the policy. The *Boyd* Court was correct in its conclusion that a covered loss must be accidental from the perspective of the insured. However, in determining the meaning of "accidental" loss only through the eyes of the owner of the automobile, *Boyd* ignored the fact that the insured making a claim under the policy in that case was the lienholder and not the owner of the intentionally destroyed vehicle. Had the lienholder in *Boyd* applied for insurance independently of the car owner's insurance, the lienholder's recovery surely would not turn on whether a loss was accidental from the perspective of a party insured under a separate policy. Likewise, where a standard loss payable clause creates a separate contract for insurance between the lienholder and the insurer, equivalent to a policy obtained independently of the car owner's policy, it is the lienholder's perspective that governs in terms of whether there has been accidental loss or damage under the policy. Thus, the correct interpretation of "accidental" loss in Allstate's policy must be from the perspective of the insured who is making a claim, which in this case is Foremost, as subrogee of the lienholder, and *not* Bobby Taylor.[2]

II

Allstate's second argument, in support of its assertion that Foremost is barred from recovery, is

[2] This interpretation of the standard loss payable clause also does not render the "any act or neglect" language of the clause superfluous, because it allows the lienholder to recover in a situation where there has been a loss under the policy from the perspectives of both the property owner and the lienholder, but the property owner's acts or neglect would otherwise invalidate the policy.

that arson is included in the meaning of the conversion proviso in the standard loss payable clause, which provides:

> [T]he conversion, embezzlement or secretion by the Lessee, Mortgagor, Purchaser or other Debtor in possession of the property insured under a bailment lease, conditional sale, mortgage or other security agreement is not covered under such policy, unless specifically insured against and premium paid therefor . . . .

Allstate argues that Bobby Taylor "converted" the lienholder's interest in his vehicle by intentionally destroying it. The majority rejects Allstate's argument, concluding that the conversion proviso focuses on the property insured and not the lienholder's interest in that property. *Ante* at 390. Thus, according to the majority, because a person cannot convert his own property, by intentionally destroying it or otherwise, the conversion proviso does not prevent Foremost from recovering on the basis that Bobby Taylor intentionally destroyed his vehicle. *Id.* at 390-391.

The majority's interpretation of the conversion proviso renders it meaningless. The proviso specifically excludes coverage where there has been "conversion, embezzlement or secretion *by* the Lessee, Mortgagor, Purchaser or other Debtor in possession of the property insured . . . ." (Emphasis added.) Therefore if, as the majority concludes, the proviso refers only to the conversion of the insured property, and a person cannot convert his own property, the proviso is clearly without any effect.

I conclude that the better interpretation of the conversion proviso follows from the purpose of the loss payable clause to protect the lienholder's intangible interest in the insured property.

That a lien holder of such character has an insurable interest is not open to question. . . . "Wherever property, either by force of law or by the contract of the parties, is so charged, pledged, or hypothecated that it stands as a security for the payment of a debt or the performance of a legal duty, each of the parties—the owner of the lien, and the person against whose property it exists— has an insurable interest in the property. The interest of a lien holder is an insurable one despite the fact that he may sue his debtor personally or that the interest is subject to contingencies." [*Booker T Theatre Co v Great American Ins Co of New York,* 369 Mich 583, 587; 120 NW2d 776 (1963), quoting 29 Am Jur, Insurance, § 453, p 790.]

Thus, because the standard loss payable clause protects the lienholder's interest in the property insured—the lien—the proviso must refer to the conversion, embezzlement, or secretion of the lien-holder's interest. This interpretation is consistent with the language of the proviso as well. While the proviso clearly refers to conversion *by* the owner of the insured property, the wording is less clear with regard to *what* must be converted, embezzled, or secreted in order to prevent coverage under the policy without the payment of an additional premium. However, because the majority's interpretation would render the exclusion a nullity, the wording must be read to refer to the lienholder's interest.[3]

Thus, the issue that must be addressed is

---

[3] There is also no doubt that an intangible interest, such as the lien insured against risk of loss under the standard loss payable clause, is subject to conversion.

The conception that an action for conversion lies only for tangible property capable of being identified and taken into actual possession is based on a fiction on which the action of trover was founded, namely, that the defendant had found the

whether, as Allstate argues, arson is included in the meaning of "conversion, embezzlement or secretion." A broad interpretation of "conversion" might support Allstate's argument that Bobby Taylor converted the lienholder's interest in his vehicle by intentionally destroying the vehicle. However, it is a familiar and well-established principle of law that courts give to an insurance policy, couched in language chosen by the insurer, a construction most favorable to the insured. *Pietrantonio v Travelers Ins Co,* 282 Mich 111, 116; 275 NW 786 (1937). Further, exceptions from coverage are strictly construed against the insurer. *Id.*

A strict reading of the words "conversion, embezzlement or secretion" does not support Allstate's argument. While, as Allstate notes, Bobby Taylor's action in destroying the car was inconsistent with the lienholder's interest in the property, Allstate's use of theft-related terms in its standard mortgage clause cannot be strictly construed to include the act of arson. As another court has found, the terms conversion, embezzlement, and secretion "suggest crimes falling within the general category of theft or larceny . . . ." *Nat'l Casualty Co v General Motors Acceptance Corp,* 161 So 2d 848, 852 (Fla App, 1964). Thus, as that court held,

An insurer will not be allowed by the use of

property of another, which was lost. This conception has become, in the progress of law, an unmeaning thing, which has been discarded by most courts. Thus, it has been declared that an action for conversion lies for every species of personal property which is the subject of private ownership, whether animate or inanimate. [18 Am Jur, 2d, Conversion, § 7, p 150.]

See also *Warren Tool Co v Stephenson,* 11 Mich App 274; 161 NW2d 133 (1968); *Tuuk v Andersen,* 21 Mich App 1; 175 NW2d 322 (1969); *Miracle Boot Puller Co, Ltd v Plastray,* 57 Mich App 443; 225 NW2d 800 (1975).

obscure phrases or exceptions to defeat the purpose for which the policy was procured, and where two interpretations are available the one allowing the greater indemnity will prevail.

Therefore, although the conversion exclusion in the standard loss payable clause could be broadly interpreted in a general tort sense to apply to arson committed by the owner of the insured property, when read strictly the proviso is no more than a limit on the theft coverage of the policy.

Thus, as one commentator has argued, the conversion proviso in the standard loss payable clause is intended to prevent a lienholder from recovering where the owner of a vehicle fails to make payment and removes the vehicle from the reach of the lienholder.[4] In such a case, the inability of the lienholder to enforce its security interest results from a credit problem rather than a risk of loss of or damage to the property for which the lienholder obtained insurance.[5] Therefore, in a case where the purchaser of an automobile under a conditional sales contract tendered a bad check to the seller and thereafter absconded with the car, the California Supreme Court held that the conversion exclusion in the insurance policy[6] prevented recovery by the lienholder. *Fiske v Niagara Fire Ins Co of New York,* 207 Cal 355; 278 P 861 (1929). The *Fiske* court reasoned that the parties, through the conversion exclusion, intended to exclude as a risk insured against the dishonest act of

---

[4] See Lehto, *The standard mortgage clause under attack: The lender's insurance claim when a borrower commits arson,* 66 U Det L R 603, 614 (1989).

[5] *Id.* at 618.

[6] The policy provided for recovery for " 'theft, robbery or pilferage . . . excepting the wrongful conversion, embezzlement, or secretion by a mortgagor or vendee in possession under mortgage, conditional sale or lease agreement . . . .' " *Fiske v Niagara Fire Ins Co of New York,* 207 Cal 355, 356; 278 P 861 (1929).

an automobile purchaser against the seller of that automobile who voluntarily put the vehicle in the hands of the purchaser under a conditional sales contract. *Id.* at 357. Thus, under this interpretation of the conversion exclusion, the lienholder retains the risk that a mortgagor might be a bad credit risk, despite the fact that through the standard loss payable clause the lienholder does not assume the risk that the mortgagor might intentionally destroy the insured property.

Therefore, under the required strict construction of the conversion exclusion in Allstate's standard loss payable clause, the terms "conversion, embezzlement or secretion" do not include within their meaning the intentional destruction of the insured property by arson. I agree with the majority that if Allstate wishes to exclude from the lienholder's coverage loss or damage that results from such an intentional act by the owner of the insured property, it may do so by expressly stating that "arson" committed by any insured is not a covered risk under the policy, or in broader terms by providing that the lienholder's right to recovery is no greater than that of the property owner.

### CONCLUSION

The standard loss payable clause in the policy protects a lienholder from loss of coverage, where the owner of the insured property intentionally destroys it, because such a loss is "accidental" from the lienholder insured's perspective and therefore is covered under the policy. Thus, a lienholder can recover when the loss is accidental from its perspective, but cannot recover, for example, when the lienholder colludes with the car owner to intentionally destroy the car. Further,

when the loss is accidental from the perspective of both the lienholder and the property owner, the lienholder's right to recovery will not be defeated by an act or neglect of the property owner that would otherwise invalidate the policy. Finally, a lienholder will not be entitled to recovery on the claim of a theft loss under the policy, when the property owner converts, embezzles, or secretes the lienholder's interest in the insured property.

I believe the foregoing analysis best fulfills the mandate that an insurance contract, like any other contract, must be construed as a whole so that all its parts are harmonized, and if possible every word must be given effect. *Associated Truck Lines, Inc v Baer,* 346 Mich 106, 110; 77 NW2d 384 (1956).

I concur in the result reached by the majority.

CAVANAGH, C.J., concurred with BRICKLEY, J.