NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0642n.06

Case No. 19-2040

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 12, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| BANK OF THE OZARKS, | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| PERFECT HEALTH SKIN AND BODY | ) | MICHIGAN |
| CENTER, PLLC, | ) | |
| | ) | |
|     Defendant, | ) | |
| | ) | |
| THEODORE BASH, D.O., | ) | |
|     Defendant-Appellant. | ) | |

Before: MERRITT, KETHLEDGE, and WHITE, Circuit Judges.

**MERRITT, Circuit Judge.** This is an appeal pursuant to the court's diversity jurisdiction regarding breach of contract claims under Michigan law relating to repayment of a bank loan for medical equipment. Loan documents were executed among plaintiff Bank of the Ozarks, and defendants Theodore Bash and Perfect Health Skin and Body Center, PLLC.[1] The district court granted partial summary judgment[2] in favor of the Bank, imposing liability on Bash as a matter of law as the personal guarantor of the loan. The crux of this appeal is whether Bash's claim that his signature was forged on a financing agreement and guaranty is a cognizable defense to his liability

---

[1] Perfect Health had a default judgment entered against it below, and it is not a party to this appeal.

[2] All other claims have since been dismissed or resolved, so the appeal is proper.

under a later-executed payment deferral agreement. The payment deferral agreement, which Bash does not dispute that he signed, stands on its own as a valid and enforceable contract that expressly waived any reliance by Bash on defenses to the earlier agreements. For the reasons below, we affirm the judgment of the district court as to Count III (Breach of the Deferral Agreement), and dismiss as moot Bash's appeal of the grant of summary judgment as to Count I (Breach of Guaranty) because it seeks payment of the same debt owed in Count III.

## I. Facts and Procedural History

Defendant Theodore Bash, D.O., is a physician in Michigan. In or around 2015, he became involved as an investor in a number of clinics providing laser therapy for various disorders. He first became involved though his friend Richard MacAuley, also a physician, who was operating and investing in sleep clinics. MacAuley introduced him to other individuals interested in investing in and managing "medical spa" clinics, including Andy Park and Pamela Lynch. A number of apparently interrelated businesses were set up by these individuals over the course of two years, and although Bash's knowledge of them, and role in them, is not entirely clear from the record, it appears he functioned mainly as an investor, not a physician. Bash contends that Park and Lynch deceived him in the course of their business dealings, including forging Bash's name on several documents.[3]

Defendant Perfect Health did business as O Bella Aesthetics, a medical spa in Okemos, Michigan. According to corporate formation documents dated October 14, 2009, Richard MacAuley was the original registered agent and sole member of Perfect Health. Ex. B at Bash's

---

[3] According to Bash, Andy Park was convicted of a felony in 2010, and, as of September 2017, Park, his wife Sara, and Pamela Lynch were under investigation by the FBI and the case was turned over to the U. S. Attorney's Office in Detroit. Bash's Opening (Blue) Brief at 4 nn. 1&2. The current existence or status of any criminal proceeding is unknown, but any proceeding has no bearing on this appeal.

Case No. 19-2040, *Bank of the Ozarks v. Perfect Health Skin & Body Ctr., et al.*

Response to Motion for Summary Judgment. A corporate resolution dated June 17, 2015, and affixed with Bash's signature, provides that

> Perfect Health Skin and Body Center, PLLC is owned 100% by Ted Bash. Richard MacAuley has no ownership interest in the company. Richard MacAuley shall be remove[d] from company bank account(s) effective as of June 1, 2015. Richard MacAuley shall remain as a clinic medical director until further notice.

Ex. 1 to Motion for Summary Judgment. Bash denies any knowledge of this corporate resolution, denies signing the resolution, and also denies that he has ever been a member, owner, managing partner, managing director, employee, agent, or representative of Perfect Health. Bash Aff. ¶ 6.[4] Bash was also listed as the "owner" of Perfect Health. Subsequent filings listed MacAuley as the registered agent, but did not list members of the company.

In July 2016, Bank of the Ozarks, sometimes referred to as Bank OZK or the Bank, executed an Equipment Finance Agreement with defendant Perfect Health, the debtor, and defendant Bash, as the purported guarantor. The agreement bears the signature "Theodore Bash" signing on behalf of Perfect Health as its "Managing Partner." Pursuant to the financing agreement, the Bank extended a loan to Perfect Health to finance the purchase of six laser machines for use in Perfect Health's medical clinic. The Bank also produced a Guaranty that was affixed to the Equipment Finance Agreement that bears the signature "Theodore Bash," and provides for Bash to personally guarantee payment of Perfect Health's obligations under the Financing Agreement. In negotiating the contract, Perfect Health represented to the Bank that Bash was its

---

[4] Bash claims that he was not a member or agent of Perfect Health. However, Bank of the Ozarks submitted a letter from Bash's prior counsel, Rita Lauer, enclosing a Financial Statement for Perfect Health prepared by Saginaw Valley Business Services. That Financial Statement includes a "Comparative Balance Sheet" that clearly identifies Bash as a "member" thereof, with capital contributions of $123,600 through year's end 2016, and $137,240.51 through year's end 2017. In addition, Bash admitted in his answers to interrogatories that he "invested in Park's Company O Bella Aesthetics, LLC" in 2015 by contributing $123,600 and two Fotona Lasers.

owner. Bash's personal guaranty on the loan was a condition of Bank of the Ozarks' agreement to enter into the Finance Agreement and extend the loan to Perfect Health. Bash claims that his signature was forged on both the Financing Agreement and Guaranty by someone with no authority to act on behalf of him or Perfect Health. Answer ¶¶ 15, 63. The Bank also produced a Certificate of Acceptance, which Bash allegedly signed on July 12, 2016, reflecting that Perfect Health had received delivery of the equipment subject to the financing agreement and inspected it. Bash contends that this signature is a forgery as well. Bash Aff. ¶ 15, attached as Ex. A to Bash's Response to Motion for Summary Judgment.

Pursuant to the Equipment Finance Agreement, Perfect Health was obligated to repay the loan to Bank of the Ozarks in 63 monthly installments of $2,922.47 plus three additional payments of $99. The Bank was granted a security interest in the equipment and assets of Perfect Health. In the event of default, the Bank was entitled to accelerate the amounts due. Perfect Health made 15 monthly payments to the Bank between July 2016 and October 2017. Martindale Decl. ¶ 6, Ex. A to Motion for Summary Judgment.

In May 2017, Perfect Health's monthly payment under the Finance Agreement, which was made via an automatic clearing-house arrangement, failed to clear; the same problem was encountered with the June 2017 payment. Beginning in July 2017, two alleged representatives of Perfect Health, identified as Andy Park and Pamela Lynch, contacted Bank of the Ozarks, and requested to enter into a deferral agreement for repayment of the loan due to a slowdown in business. *Id.* ¶ 8. The Bank told Park and Lynch that Bash would have to contact the Bank personally to arrange for any payment deferral. *Id.* On or about September 16, 2017, Bash contacted Bank of the Ozarks and said that Andy Park was no longer with Perfect Health, and directed the Bank not to discuss any of Perfect Health's business with Park. *Id.* ¶ 9. Bash requested

to be told the full amount owed by Perfect Health and said he would try to make that payment by September 28, 2017. *Id*. On or about September 20, 2017, Bash spoke with a Bank representative and made arrangements to pay Perfect Health's past due debt under the Financing Agreement with a personal credit card. On or about October 23, 2017, a conference call was held between Bash's attorney and the Bank. *Id*. ¶ 10. Bash's attorney requested Perfect Health's payment history under the Finance Agreement, and told the Bank he would confer with Bash. The attorney told the Bank that Bash planned to keep the equipment and pay off the loan. The Bank advised Bash's attorney that Perfect Health was in default under the Agreement, and requested that the September payment be made before October 28, 2017. On October 26, 2017, Bash's attorney called Bank of the Ozarks and indicated that he would arrange for Bash to speak with the Bank directly and make the September payment. As a result of the negotiations between Bash, Bash's wife, Patti, Bash's attorney and the Bank, an agreement was reached to enter into a payment deferral agreement. Based on this understanding, on October 26, 2017, Patti Bash contacted the Bank to make the September payment via personal credit card, and to request that the new agreement be sent to Bash at his email address. On November 22, 2017, Bank of the Ozarks, Perfect Health, and Bash entered into the Payment Deferral Agreement, whereby certain payments due under the Equipment Financing Agreement were deferred until the end of the loan term. The Deferral Agreement provides in full as follows:

### PAYMENT DEFERRAL AGREEMENT
Contract #13764-001

This Payment Deferral Agreement ("Agreement") is made and entered into by and among Bank of the Ozarks (the "Secured Party") Perfect Health Skin and Body Center PLLC (the "Debtor"), and Theodore Bash (the "Guarantors").

WHEREAS, the Secured Party and the Debtor are parties to that certain Equipment Finance Agreement (the "Finance Agreement") dated effective as of July 28, 2016 (i.e., the date the Finance Agreement was accepted by the Secured Party);

WHEREAS, Theodore Bash the Guarantors personally guaranteed the debts, liabilities, and obligations of the Debtor to the Secured Party under the Finance Agreement;

WHEREAS, the Debtor and the Guarantor have requested that two (2) of the payments presently due under the Finance Agreement be deferred, and the Secured Party has agreed to such deferral, on the terms and conditions set forth below;

NOW THEREFORE, the Secured Party, the Debtor, and the Guarantor hereby agree as follows:

1.      Deferral of Payment. The monthly payments presently due under the Finance Agreement executed on July 28, 2016 in the amount of $2,922.47 shall be deferred until the month following the end of the initial term of the Finance Agreement, and the term of the Finance Agreement shall be extended two (2) additional months. The deferred payment shall be due and payable, with interest in the two (2) month[s] of the extended term of the Finance Agreement in the amount of $2,944.38.

2.      Interest Payment The Debtor shall pay the Secured Party interest on the unamortized principal obligation evidenced by the Finance Agreement for the deferral period, in the amount [of] $609.80 for October 2017 and $598.25 for November 2017.

3.      Consent of Guarantor.  The Guarantor hereby consents to the payment deferral as provided in this Agreement.

4.      Reaffirmation of Obligations. The Debtor and the Guarantor hereby reaffirm their respective obligations to the Secured Party under the Finance Agreement, as modified hereby, and the Guarantor's Guaranty thereof.  The Debtor and the Guarantor hereby confirm that their respective obligations to the Secured Party are not subject to any disputes, defenses, or adjustments of any kind whatsoever, and that neither the Debtor nor the Guarantor has any claims of any kind whatsoever against the Secured Party.

5.      Effect of this Agreement.  In the event of a conflict between the terms of this Agreement and the terms of the Finance Agreement, the provisions of this Agreement shall prevail.  Except as expressly set forth in this Agreement, however, all of the provisions of the Finance Agreement shall remain unchanged and shall continue in full force and effect.  This Agreement is hereby incorporated into the Finance Agreement for all purposes.

Bash's signature appears on the document on behalf of debtor Perfect Health, but the title line is

blank because he contends he has no relationship with Perfect Health.  Bash Aff. ¶ 24.  Bash also

signed in his capacity as guarantor. Bash does not dispute that he signed the Payment Deferral Agreement.

Bash or his wife personally made four payments under the Finance Agreement, and then under the Deferral Agreement, using their personal credit cards: one payment on September 20, 2017 for $2,922.47; another on October 26, 2017 also for $2,922.47; a third payment on November 21, 2017 for $1,208.10; and a final payment on January 22, 2018, for $500.00. The January 22, 2018 payment was the last payment Bank of the Ozarks received on the loan; a balance of $139,822.38 remained at the time.[5]

On June 12, 2018, Bank of the Ozarks filed a complaint against defendants Perfect Health and Bash. The complaint was amended on July 20, 2018. The amended complaint alleges that Perfect Health is in default of its obligations under the Equipment Financing Agreement between Bank of the Ozarks and Perfect Health, and that $139,822.38 remains due and owing. The Bank filed a motion for partial summary judgment solely against Bash on Count I (Breach of Guaranty), and against Bash and Perfect Health on Count III (Breach of Deferral Agreement) of its Amended Complaint. Bash responded, and the Bank replied. The Bank's motion was granted by the district court. *Bank of the Ozarks v. Perfect Health Skin and Body Ctr. PLLC, et al.*, No. 1:18-cv-1187, 2019 WL 316466 (E.D. Mich. Jan. 24, 2019). The district court denied Bash's motion for reconsideration on the ground it raised the same arguments rejected in the order granting partial summary judgment. This timely appeal followed.

---

[5] On June 20, 2018, shortly after filing its complaint in this case, Bank of the Ozarks filed an *ex parte* motion for possession pending final judgment. The motion also requested an *ex parte* restraining order pending a hearing on the motion for possession pending final judgment. On June 21, 2018, the district court entered an order denying the Bank's request for an *ex parte* restraining order, but scheduled a hearing. A hearing on the motion for possession pending judgment was held on July 11, 2018. The motion was granted.

## II. Discussion

On appeal, Bash challenges the district court's order granting partial summary judgment to the Bank on Counts I (Breach of Guaranty Against Bash) and III (Breach of Deferral Agreement Against Bash and Perfect Health) of the Amended Complaint. Counts I and III relate to the same underlying debt (about $140,000), and Bash and Perfect Health are jointly and severally liable to the Bank on Count III. The Bank is therefore entitled to collect the debt for the amount due from either defendant. The Bank sought entry of a default judgment against Perfect Health in February 2019, which was granted. Perfect Health is not a party to this appeal. Accordingly, we need only reach the merits as to Bash on Count III, Breach of the Deferral Agreement, and Count I, Breach of the Guaranty. All other counts in the Amended Complaint have been resolved or dismissed.

Bash's main argument on appeal is that the district court failed to address the alleged forgeries of Bash's signature to the Equipment Finance Agreement and the attached personal Guaranty.[6] Bash contends that the alleged forgeries raise a question of fact precluding summary judgment because the forgeries, if proved, render the Equipment Finance Agreement and Guaranty *void ab initio*. He argues he could not ratify or otherwise affirm nonexistent agreements by signing the Payment Deferral Agreement. He also argues that the Payment Deferral Agreement is void because an authorized representative of Perfect Health did not sign it.

### A.      Standard of Review

On review of a grant of summary judgment, a court views all evidence and draws all inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255

---

[6] Contrary to Bash's assertions in his briefs, the district court did not make any judgments regarding the credibility of Bash's claims of forgery in support of its finding that Bank of the Ozarks was entitled to judgment in its favor as Bash has claimed; rather, the court's determination that the Bank was entitled to summary judgment was based solely upon the undisputed fact that Bash signed the Payment Deferral Agreement, the unambiguous terms of which validated the Guaranty and waived the defense of forgery.

(1986). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. To defeat a properly supported motion for summary judgment, the nonmoving party must cite to evidence in the record. Fed. R. Civ. P. 56(c).

**B.      Breach of the Payment Deferral Agreement (Count III)**

The elements of a valid contract under Michigan law, the contract law cited to and discussed by both parties, are: (1) parties competent to contract; (2) proper subject matter; (3) consideration; (4) mutual agreement; (5) mutual obligation. *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. App. 1990). To recover for breach of contract under Michigan law, a plaintiff must prove (1) that a contract existed between the parties; (2) the terms of the contract; (3) that the defendant breached the contract; and (4) that the breach caused plaintiff's injury. *Platsis v. E. F. Hutton & Co*., 642 F. Supp. 1277, 1309 (W.D. Mich. 1986) (applying Michigan law). Bash has not shown how the alleged unenforceability of the Finance Agreement or the Guaranty defeats any of these elements with respect to the Deferral Agreement. Although the Deferral Agreement references the Finance Agreement, the Deferral Agreement is a validly formed contract on its own. Its express terms reaffirm the obligations in the Finance Agreement and Guaranty, and waive any reliance or defenses to the earlier agreements:

> 4.      Reaffirmation of Obligations. The Debtor and the Guarantor hereby reaffirm their respective obligations to the Secured Party under the Finance Agreement, as modified hereby, and the Guarantor's Guaranty thereof. The Debtor and the Guarantor hereby confirm that their respective obligations to the Secured Party are not subject to any disputes, defenses, or adjustments of any  kind whatsoever, and that neither the Debtor nor the Guarantor has any claims of  any kind whatsoever against the Secured Party.

The Deferral Agreement preserves the terms of the earlier agreements by reference, except as modified by the Deferral Agreement:

> 5.     Effect of this Agreement.  In the event of a conflict between the terms of this Agreement and the terms of the Finance Agreement, the provisions of this Agreement shall prevail. Except as expressly set forth in this Agreement, however, all of the provisions of the Finance Agreement shall remain unchanged and shall continue in full force and effect.  This Agreement is hereby incorporated into the Finance Agreement for all purposes.

Under black letter Michigan law, a court is "obligated to accept as the agreement of the parties the plain meaning of the words used." *Stine v. Cont'l Cas. Co.*, 349 N.W.2d 127, 138 (Mich. 1984).  "In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005). "[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003) (quoting *State Farm Fire and Cas. Co. v. Old Republic Ins. Co.*, 644 N.W.2d 715 (Mich. 2002)).  "If the language of the contract is clear and unambiguous, it must be enforced as written." *McCoig Materials, LLC v. Galui Const., Inc.*, 818 N.W.2d 410, 416 (Mich. 2012). In *Whittlesey v. Herbrand Co.,* the Michigan Supreme Court stated that "'[i]n a written contract a reference to another writing, if the reference be such as to show that it is made for the purpose of making such writing a part of the contract, is to be taken as a part of it just as though its contents had been repeated in the contract.'"  187 N.W. 279 (Mich. 1922) (quoting *Short v. Van Dyke*, 52 N.W. 643 (Minn. 1892)); *see also Forge v. Smith*, 580 N.W.2d 876, 881 (Mich. 1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together.").

Applying these basic contract concepts, the district court granted summary judgment to Bank of the Ozarks on its breach of the Deferral Agreement claim because it found that the Bank's motion for summary judgment

> posits a simple theory: (1) Dr. Bash signed the Deferral Agreement; (2) the Deferral Agreement incorporates the Guarantee and the Equipment Financing Agreement by reference and reaffirms the parties' obligations thereunder; (3) Bash breached those obligations; (4) Dr. Bash is liable.

2019 WL 316466, at *3. As the district court notes, Bash does not dispute that he signed the Deferral Agreement, and because the unambiguous terms of that agreement reaffirmed the obligations under the Equipment Finance Agreement and the Guaranty, a new, valid contract was formed between Bash and the Bank. Furthermore, the Deferral Agreement expressly waives Bash's reliance on "any disputes, defenses, or adjustments of any kind whatsoever. . . .," which includes Bash's allegations of forgery on the earlier contracts. *See, e.g.*, *Fourteen Corp. v. Magnoli*, No. 13-11803, 2013 WL 4551705, at *6 (E.D. Mich. Aug. 28, 2013) (granting summary judgment after finding a guarantor's affirmative defenses barred by a contractual waiver); *Fifth Third Bank v. Cleveland Imaging and Surgical Hosp., LLC*, No. 1:10-cv-624, 2012 WL 13018600, at *4-*5 (S.D. Ohio Mar. 27, 2012) (similar facts to this case regarding waiver of defenses, but analyzed under Ohio law). Accordingly, the district court found Bash liable for the debt under the express terms of the Payment Deferral Agreement without regard to the alleged forgery in the earlier agreements.

Despite the express language of the Deferral Agreement, Bash presents two arguments challenging his liability for breach of the Deferral Agreement: (1) the Deferral Agreement cannot be valid because it is based on the Equipment Finance Agreement and Guaranty, which Bash argues are *void ab initio*; and (2) he was not authorized to sign the payment Deferral Agreement

on behalf of Perfect Health because he was not a member, owner, managing partner, managing director, employee, agent, or representative of Perfect Health, so the Deferral Agreement is invalid.

1. **The District Court Did Not Need to Make a Finding as to the Validity of the Guaranty and the Equipment Finance Agreement**

Bash takes the position that the Equipment Finance Agreement and Guaranty are *void ab initio* due to alleged forgery of his signature on the two contracts. *See, e.g., Fed. Deposit Ins. Corp. v. Fedorov*, No. 10–11061, 2010 WL 2944569, at \*4 (E. D. Mich. July 22, 2010) (finding that forgery defeats a breach of contract claim because, if true, there is no mutuality of agreement). He reasons that the Deferral Agreement therefore must be void as well because it incorporates and reaffirms terms from nonexistent agreements. He then concludes that any alleged forgery of the Equipment Finance Agreement and Guaranty creates a genuine issue of material fact defeating summary judgment on the Bank's claim of breach as to the Payment Deferral Agreement.

Bash's affidavit attached to his response to the Bank's motion for partial summary judgment focuses solely on the allegedly forged signatures on the Equipment Finance Agreement and Guaranty. But Bash fails to explain why he went ahead and signed the Deferral Agreement, which ratified and reaffirmed the debt incurred by the terms of the Equipment Finance Agreement and his responsibility for that debt under the Guaranty, if in fact the earlier contracts were forged. Bash could have refused to enter into the Deferral Agreement, but he chose to sign it and thereby agreed to its terms. He does not contend that at the time of signing the Deferral Agreement he was unaware of the possible forgery of the Equipment Finance Agreement and Guaranty. Furthermore, any defenses, such as forgery, to the validity of the Finance Agreement and Guaranty were waived by the express terms of the Deferral Agreement. Therefore, any dispute over whether the earlier contracts were forged is not material in determining whether the Deferral Agreement was breached, and the guarantee of payment by Bash contained within it is binding. *St. Francis Health*

*Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000) (irrelevant or unnecessary factual disputes do not create genuine issues of material fact). A fact is "material" only if its resolution affects the outcome of the lawsuit. *Lenning v. Comm. Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). Bash simply has not raised any genuine issue of material fact as to the breach of the Payment Deferral Agreement.

Bash cites *PNC Bank v. Goyette Mechanical Company*, 140 F. Supp. 3d 623, 632 (E.D. Mich. 2015), for the proposition that the Guaranty and Equipment Finance Agreement are unenforceable due to forgery. Bash's reliance on that case is ill-placed, as it supports the Bank's position rather than Bash's. In *Goyette*, the plaintiff PNC Bank moved for summary judgment on its claim for breach of contract against two defendant borrowers on a commercial line of credit. In responding to the motion, defendant E.L. Mechanical argued that its president's signatures on the initial loan documents were forged and no contract was formed. The court rejected this contention because, among other reasons, E.L. Mechanical's president had admitted to signing a Cash Collateral Agreement in which he "'ratified and confirmed [the representations in those documents] without condition as if made anew' . . . [and] also 'confirmed that its obligations under the loan documents 'remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Agreement.'" *Id*. at 633 (first alteration in original). The court concluded, "[t]here is no *genuine* dispute on the present record that [the president] signed the loan documents . . . ." *Id*. (emphasis in original).

Furthermore, it is undisputed that the Bank granted a payment deferral to Bash under the terms of the Deferral Agreement, and allowed him to continue using the equipment rather than repossessing it. The Bank's records clearly show that Bash personally made payments to the Bank on the Deferral Agreement. As a general proposition, a party entering into a payment deferral

agreement may not avail itself of the benefits of that contract, and then attempt to escape its

obligations thereunder by claiming the original contract was unenforceable. An instructive case

with similar facts from another jurisdiction is *Agristor Leasing-II v. Pangburn*, 557 N.Y.S.2d 183,

185 (N.Y.S. 1990) (internal citations omitted), in which the court held:

> Additionally, the fact that defendant signed a payment deferral agreement bars him from challenging the original agreement on the ground of fraud. Whether under a waiver or ratification analysis, a party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it. . . . By signing the payment deferral agreement, defendant was allowed to continue using the equipment and his default in payments was excused.

Although not involving an alleged forgery, a similar case is presented in *Osman v. Kaniuk*,

No. 95-cv-1405, 1996 WL 1088914 (E.D.N.Y. Sept. 9, 1996). Despite an alleged fraud-in-the-

inducement defense in a suit to pay back a loan, Kaniuk ratified the loan agreement. The district

court found Kaniuk was bound by its terms and granted summary judgment to the lender:

> A party ratifies a contract under which he might not otherwise be bound due to duress or fraud where he accepts benefits under the contract, remains silent or acquiesces in the contract for a long period of time after an opportunity exists to have it declared void, or acts upon the contract by affirmatively acknowledging it or performing under it. . . .
>
> While this is not a case of duress, I am persuaded that the reasonableness standard should apply here and I find that Kaniuk did not act reasonably if he was indeed fraudulently induced into entering this loan agreement. First, this loan agreement was between sophisticated businessmen who were continuously involved in business deals and transactions. . . .
>
> Second, Kaniuk knew that no other party had paid Osman the $100,000 after the loan agreement was signed, and yet he executed two documents long after the original agreement was entered that declared his intention to remain "jointly and severally" liable on the loan. This is squarely inconsistent with Kaniuk's contention that once the money was loaned, Kaniuk had no obligation to pay Osman. If Kaniuk indeed believed that he was not liable to Osman on the loan once the money was transferred, there is no rational explanation for his execution of these subsequent documents other that he subsequently conceded his obligation to pay Osman.

> Third, Kaniuk continued to benefit for several years from the use of the money in a Northport, Long Island investment after knowing that the money had not been paid back to Osman by the alleged third parties. Finally, and especially telling, is the fact that Kaniuk does not contest in opposition papers Osman's contention Kaniuk subsequently ratified his obligations under this loan agreement.

*Id.* at *2.

For the foregoing reasons, the district court did not err in finding that resolution of the question of any alleged forgery on the Equipment Finance Agreement and the Guaranty is not necessary to determine the validity of the enforceability of the Deferral Agreement.

## 2. <u>Lack of signature by an authorized representative of Perfect Health</u>

Bash also argues that he should be excused from any obligations under the Deferral Agreement because he claims he was not authorized to execute that contract on behalf of Perfect Health. Assuming that Bash was without authority to enter into the agreement on behalf of Perfect Health, that would excuse only Perfect Health under the Deferral Agreement, not Bash. Bash counters that the Deferral Agreement required the signatures of all three parties, not just Bash to be enforceable. This argument was rejected by the district court:

> With respect to Count III (breach of Deferral agreement), Dr. Bash argues that he was not authorized to sign on behalf of Perfect Health because he was not a member, owner, managing partner, managing director, employee, agent, or representative of Perfect Health. Thus, he contends that his signature on behalf of debtor Perfect Health was invalid. He concludes, therefore, that the entire Deferral Agreement is invalid. He offers no support for this inferential suggestion. Bank OZK has moved for summary judgment against Dr. Bash, not Perfect Health. Irrespective of whether Dr. Bash's signature on behalf of Perfect Health was effective to bind Perfect Health, it is undisputed that he also signed on behalf of

himself in his capacity as Guarantor. Dr. Bash certainly had the authority to bind himself.

2019 WL 316466, at *3.

Under the Deferral Agreement, Bash, as the guarantor of the debt, is liable for the default of Perfect Health. As the district court points out, the Bank moved for summary judgment against Bash only, not Perfect Health, as was its right. The signature of a principal—authorized or not—is not a requirement for an enforceable guaranty; contracts of guaranty are routinely signed only by the guarantor. *See, e.g., Campbell v. Brower*, 248 N.W. 581, 582 (Mich. 1933) ("It is not necessary the principal sign the bond."). The Michigan statute of frauds also supports this conclusion; it only requires that a guaranty be signed "by the party to be charged with the agreement, contract, or promise." M.C.L. § 566.132(1). Although the agreement being enforced is a deferral agreement rather than a stand-alone guarantee agreement, the same general principles apply, given that the Bank is seeking to enforce the explicit guarantee terms contained in an agreement signed by the guarantor. Therefore, Bash's claim that he was not authorized to bind Perfect Health has no effect on the enforceability of the Deferral Agreement on him as guarantor.

In their jointly filed Answer to the Amended Complaint, Bash and Perfect Health expressly admitted that, "[a]s of January 22, 2018, Perfect Health has failed to make any monthly payments to Bank as required by the [Equipment Finance] Agreement and the Deferral Agreement, and as such, Perfect Health has defaulted on its obligations owed to Bank thereunder. . . ." Amended Complaint at ¶ 31; Answer to Amended Complaint at ¶ 31. The district court specifically relied on Bash's admission to the default under the Finance Agreement and Deferral Agreement in finding him liable. 2019 WL 316466, at *4. Judicial admissions "'have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'" *Cadle Co. II v. Gasbusters Prod. I Ltd. P'ship*, 441 F. App'x 310, 312-13 (6th Cir. 2011); *see also Brown v. Tenn.*

*Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980) ("Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court."). "A judicial admission renders a fact 'uncontested' in a summary judgment proceeding." *Goyette*, 140 F. Supp. 3d at 632. Because Bash expressly admitted Perfect Health's liability under the Deferral Agreement, and he is the guarantor on the loan, Bash's authority to sign the Deferral Agreement on behalf of Perfect Health is irrelevant.

## C.     Breach of Guaranty (Count I)

Counts I and III of the Amended Complaint cover the same debt, and, as expressly set out in the Deferral Agreement, Bash reaffirmed his obligations under the Finance Agreement and the Guaranty in that contract. By granting summary judgment to the Bank on the breach-of-the-Payment-Deferral-Agreement claim (Count III), Bash was liable for the debt. Because the debt owed by Bash under the Deferral Agreement in Count III is the same debt as that sought under the Guaranty in Count I, we dismiss Bash's appeal of Count I as moot.

For the foregoing reasons, the district court properly awarded partial summary judgment to Bank of the Ozarks for breach of contract on the Payment Deferral Agreement (Count III), and we therefore affirm the judgment of the district court. We dismiss the appeal of Count I as moot.